Parker G. Stinar, Esq. (pro hac vice forthcoming)
Patrick C. Lannen, Esq. (pro hac vice)
**STINAR LANNEN, PLLC**
280 W. Maple Rd., Ste. 200
Birmingham, Michigan 48009
Tel: (248) 565-2690
Fax: (248) 565-2691
Email: Parker@StinarLannenLaw.com
Patrick@StinarLannenLaw.com

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| IN RE: APPLE AIRTAG MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates To:<br><br>JANE R.G. DOE - 4,<br><br>Plaintiff,<br><br>v.<br><br>APPLE INC.,<br><br>Defendant. | MDL No. 3199<br>Case No. 5:26-md-03199-NW<br>Member Case No. ___________<br>Hon. Noël Wise<br><br>**COMPLAINT FOR DAMAGES**<br><br>1. Negligence (California Law)<br>2. Strict Products Liability—Design Defect (California Law)<br>3. Products Liability—Failure to Warn (California Law)<br>4. UCL—Unlawful Prong (California Law)<br>5. UCL—Unfair Prong (California Law)<br>6. Strict Products Liability—Design Defect (Missouri Law; Mo. Rev. Stat. § 537.760) (in the alternative)<br>7. Strict Products Liability—Failure to Warn (Missouri Law; Mo. Rev. Stat. § 537.760) (in the alternative)<br>8. Negligence (Missouri Law) (in the alternative)<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff, through counsel, brings this Complaint against Defendant Apple Inc. She files it directly in In re Apple AirTag Marketing, Sales Practices and Products Liability Litigation, MDL No. 3199, under the Court's direct-filing order. She alleges as follows, on personal knowledge as to herself and on information and belief as to all other matters.

## INTRODUCTION

1. Defendant Apple Inc. ("Apple") must be held accountable for its continuing failure to protect the public from being stalked with its product, the Apple AirTag® ("AirTag").

2. In 2021, Apple released the AirTag. It knew the device could—and would—be bought and used by abusive, controlling people to track, coerce, and endanger their victims.

3. Apple also knew in 2021 that adequate safeguards were not yet in place. It released the AirTag anyway. Since then, Apple has played catch-up. It has quietly added features that still fail to curb the dangers of a product that is now more than five years old.

4. Plaintiff is one of the people Apple's choices left exposed. In April 2025, a former romantic partner used an Apple AirTag in connection with the parties' minor children to try to learn Plaintiff's protected location in Missouri.

5. Plaintiff carried an iPhone and received an AirTag notification within about ten minutes. That alert did not undo the harm; by the time Plaintiff found the device, she had already been forced to confront the risk that her protected location could be exposed.

6. Plaintiff later learned that the AirTag had been placed in one of the children's shoes. Plaintiff reported the tracking to police, and court testimony later confirmed that the AirTag incident had been raised in family-court proceedings.

7. Apple's design, warning, and release decisions were made at its headquarters in Cupertino, California. Those decisions give rise to liability under California law. In the alternative, and to the extent Missouri law governs any issue, Apple's acts and omissions support the Missouri-law counts pleaded below. Plaintiff seeks actual, punitive, exemplary, restitutionary, and other relief.

## PARTIES

8. Plaintiff is an adult individual. She is domiciled in, and a citizen of, the State of Missouri. She intends to remain in Missouri indefinitely.

9. Defendant Apple Inc. is a corporation organized under the laws of the State of California. Its principal place of business is in Cupertino, California. Apple is therefore a citizen of California for purposes of 28 U.S.C. § 1332(c)(1). Apple is an American multinational technology company. Among its consumer electronics is the AirTag. Apple oversees all aspects of the AirTag, including its design, manufacture, marketing, technical support, and maintenance.

Apple also designs, operates, and maintains the Find My network through which AirTags function, and the unwanted-tracking alerts on which persons like Plaintiff depend.

## JURISDICTION, VENUE, AND DIRECT FILING

10. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1). Complete diversity exists. Plaintiff is a citizen of Missouri. Apple is a citizen of California. No defendant shares Plaintiff's citizenship.

11. The amount in controversy exceeds $75,000, exclusive of interest and costs. Plaintiff seeks actual damages for severe mental anguish, emotional distress, fear for her physical safety, loss of her sense of autonomy and security, and related losses. She also seeks punitive or exemplary damages. Together, these damages exceed the jurisdictional threshold.

12. This Court has general and specific personal jurisdiction over Apple. Apple is incorporated in California and has its principal place of business in this District. Apple is at home here.

13. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Apple resides in this District. Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred here. On information and belief, Apple designed the AirTag, designed its anti-stalking safeguards, decided to release it, and decided how to warn the public from its Cupertino headquarters. Plaintiff chooses this District as the venue for this action for all purposes, including trial.

14. Plaintiff files this Complaint directly in this District and in MDL No. 3199, as permitted by Pretrial Order No. 1 (the "Direct Filing Order"). Under the Direct Filing Order, Plaintiff designates the Northern District of California as the proper venue for this action.

15. Venue in this District does not depend on the Direct Filing Order. Because Apple resides here and a substantial part of the events and omissions giving rise to Plaintiff's claims occurred here, Plaintiff could have filed this action in this District independent of MDL No. 3199. Plaintiff does not designate any other district as her home or transferor venue.

16. Intradistrict Assignment. Under Civil L.R. 3-2(c) and 3-5(b), this action relates to MDL No. 3199. It should be assigned to the Division and the Judge presiding over that proceeding.

## CHOICE OF LAW

17. California law governs Plaintiff's claims. Plaintiff pleads her California-law claims first, in Counts I through V. She pleads her Missouri-law claims in the alternative.

18. California law should govern Plaintiff's claims. This action was filed in this District, and California's choice-of-law rules therefore apply. The conduct Plaintiff challenges occurred in California. On information and belief, Apple's officers and managing agents in Cupertino made the decisions to release the AirTag with safeguards Apple knew were inadequate; to keep selling it after tens of thousands of stalking reports; to deliver safety fixes through owner-dependent firmware; and to describe stalking incidents to the public as rare. California has a strong interest in regulating the conduct of a California corporation that designs dangerous products in California and sells them nationwide.

19. In the alternative, Missouri law should govern the Missouri-law counts to the extent the Court determines that Missouri has the greater interest in any issue. Plaintiff was tracked in Moscow Mills, Missouri and suffered her injuries there.

20. Plaintiff does not concede that any conflict exists between Missouri and California law on any issue. If a true conflict exists, Plaintiff reserves the right to brief the choice of law at the appropriate stage.

## GENERAL ALLEGATIONS

21. On April 2, 2024, ITV News in the United Kingdom aired a report on AirTag stalking. In response, Apple stated: "We have identified even more ways we can update AirTag safety warnings and help guard against further unwanted tracking."

22. This promise of future, unspecified action came too late for Plaintiff. The time for adequate safety warnings and better protections was April 2021, before the AirTag's release. It is unconscionable for Apple to keep on the market a product it knows is still unsafe.

23. Apple has always known that any safeguards it built into AirTags would only, in Apple's own words, "deter as opposed to prevent malicious use."

24. Each year, an estimated 13.5 million people are stalked in the United States. Nearly one in three women and one in six men experience stalking at some point in their lives.

25. Apple's AirTags have become a critical—and shameful—part of this problem. From 2021 forward, Apple has received over 40,000 stalking reports, at times averaging 1,000 complaints per month.

26. Stalking takes many forms. Most often it involves unwanted, repeated behavior that would cause fear in a reasonable person. Whatever the method, the common thread is the fear it creates in the victim.

27. That fear erodes a victim's autonomy and disrupts daily life. One in eight employed stalking victims misses work because of the victimization. More than half of those lose more than five days of work. One in seven stalking victims moves as a result.

28. Stalking victims suffer much higher rates of depression, anxiety, insomnia, and social dysfunction than the general population. Most report a fear of not knowing what will happen next. Stalking is a significant risk factor for homicide in abusive relationships.

29. No one disputes any of this. Stalking is a serious, well-documented phenomenon. It ruins lives, and it ends them.

30. Knowing all this, Apple released a small, concealable device. It allows anyone with an iPhone to continuously and precisely track another person's location for $29.00.

31. Before releasing the AirTag in April 2021, Apple knew it would be used as a stalking tool. Apple even designed certain features to reduce that risk. But Apple released the product knowing those features could not prevent stalking.

32. At release, Apple knew the AirTag's anti-stalking measures were inadequate for at least these reasons:

a. The iPhone notification system alerted users to an unknown AirTag only after three days—an eternity in a stalking situation;

b. Android users received no notifications at all, leaving roughly half of the smartphone-using population unprotected;

c. The AirTag's speaker, meant to alert a victim to an unknown AirTag, was quiet, easily muffled, and easily defeated, and instructions for disabling it were widely available online; and

d. The AirTag's small, light, and concealable form made it trivially easy to hide in a victim's belongings or vehicle.

33. Apple made a calculated business decision to release the AirTag anyway. It put market timing and profits ahead of human safety.

34. The consequences were swift and predictable. Soon after the April 2021 release, reports poured in from people who had been stalked, tracked, and terrorized with AirTags.

35. Stalkers have used AirTags to track victims to their homes, workplaces, and places of refuge. AirTags have been hidden in wheel wells, under bumpers, in purses, in jacket pockets, and in children's backpacks.

36. AirTags have enabled abusers in domestic situations to monitor and control the people closest to them. Many victims had no idea they were being tracked until it was too late.

37. The consequences have been as severe as possible. Multiple murders have occurred in which the killer used an AirTag to track the victim.

38. With its "stalker-proof" protections exposed as inadequate, Apple has spent five years scrambling. Most of these failures persist. Apple keeps reacting to harm its product has caused instead of preventing it.

## FACTUAL ALLEGATIONS

### A. How the AirTag Works

39. Apple introduced the AirTag in April 2021 as a standalone product. It is about the size of a U.S. quarter. It is a tracking beacon marketed to help consumers find objects such as keys or purses.

40. The AirTag uses Bluetooth Low Energy (“BLE”) technology. It broadcasts a rotating identifier. Nearby Apple devices detect that signal and relay the AirTag’s location to Apple’s servers through the Find My network.

41. The Find My network turns the world’s Apple devices into a mesh tracking network. Any powered-on, connected iPhone, iPad, or Mac can relay an AirTag’s location. The network works silently, without the knowledge or consent of the device owners who relay the data.

42. As a result, an AirTag’s location can be updated virtually anywhere—including on the streets, parking lots, and driveways of Moscow Mills, Missouri.

**B. Apple Knew the AirTag Would Be Used to Stalk**

43. Before the AirTag’s release, commentators, journalists, and domestic violence advocates publicly warned that small, cheap Bluetooth trackers would be used as stalking tools.

44. Apple was well aware of these concerns. Apple anticipated that the AirTag would be used for unwanted tracking.

45. Apple described the AirTag’s anti-stalking features as designed to “deter as opposed to prevent” malicious use. That was an admission that Apple knowingly released the product with inadequate safeguards.

46. Apple launched the AirTag with only minimal safeguards. These were an audible alert that sounded after three days away from the owner’s iPhone and a notification that alerted iPhone users—but not Android users—to an unknown AirTag traveling with them.

47. These measures were woefully inadequate. Three days without an alert gives a stalker ample time to learn a victim’s home, workplace, and routine.

48. About half of U.S. smartphone users use Android devices. At launch, they had no way to detect an AirTag tracking them. Apple released a Tracker Detect app for Android in December 2021, eight months after launch. The app required users to start a scan manually.

49. In February 2022, Apple announced it would cut the time before an unknown AirTag sounds from three days to a random interval between 8 and 24 hours. Even that interval gives a stalker ample time to locate a victim’s home, workplace, and routine.

50. Apple's piecemeal approach—half-measures adopted only after public outcry—shows that Apple has consistently put sales ahead of safety.

**C. The AirTag's Safeguards Fail**

51. Apple's protections fail even the iPhone users they were built for.

52. The iOS Item Safety Alerts feature relies on algorithms that often fail to detect tracking in time. An unknown AirTag must travel with the victim for some period before any alert issues. During that window, the stalker can watch the victim's every move.

53. The alerts are easy to miss. They look like ordinary push notifications. They can be buried, swiped away, or simply overlooked. Users who turn off Location Services for privacy reasons also lose these alerts. Apple does not explain this.

54. An alert, standing alone, does not tell the victim where the AirTag is. To find it, the victim must rely on the AirTag's sound. That sound is deficient in at least four ways:

a. It is too quiet. A purse, fabric, or a car's exterior can muffle it;

b. It is not distinct. The chime sounds like countless other device alerts;

c. It is not continuous. It stops before the person can find the device; and

d. It is easily disabled. The AirTag keeps working after the speaker is removed, and online tutorials explain how.

55. Even when a victim finds an AirTag, her options are limited. She must take physical possession of it and remove its battery. Finding it may be impossible or costly. Dismantling it can compromise evidence. And the stalker can simply deploy another AirTag.

56. Safety updates to AirTag firmware are not pushed automatically to the victim. They depend on the AirTag's owner—the stalker—to install them.

**D. Feasible Safer Alternative Designs Existed**

57. At all relevant times, safer alternative designs existed. Each would have prevented or significantly reduced the risk of AirTag stalking without substantially impairing the product's utility for finding lost items. Each was economically and technologically feasible when the AirTag

left Apple's control, using existing or reasonably achievable scientific knowledge. Among other things, Apple could have:

a. alerted a tracked person within minutes, not hours or days;

b. designed a louder, distinct, continuous, non-removable, and tamper-resistant speaker, and rendered the AirTag non-functional if the speaker were disabled;

c. enabled precise, on-demand location of an unknown AirTag by the person it is traveling with, so the victim could find a concealed device without police help;

d. required identity verification or account linking before activation, creating accountability and deterring anonymous stalking;

e. automatically disabled tracking when an AirTag stays near a non-owner's device for a defined period;

f. required periodic owner re-authentication to prevent indefinite passive tracking;

g. released simultaneous, equivalent, automatic detection for Android users at launch; and

h. made the AirTag larger and more conspicuous, so it could not be easily hidden under a vehicle's bumper or in belongings.

58. Apple chose not to adopt these designs.

59. Only weeks after the AirTag's release, Apple CEO Tim Cook was briefed on press reports describing the AirTag as a new means of inexpensive, effective stalking. Apple chose to manage the narrative instead of the danger.

60. Apple's officers, directors, and managing agents authorized, directed, or ratified the decision to release and keep selling the AirTag with inadequate safeguards.

61. Apple publicly called AirTag stalking rare. Its internal data showed more than 40,000 unwanted-tracking reports in the three years after release, ending in April 2024.

62. Apple has also failed to support victims. Its legal-process guidelines state that AirTag pairing history is available for only up to 25 days. Victims who seek police help often cannot identify the owner before the records disappear.

63. The harm is ongoing. Apple continues to sell AirTags with safeguards that remain inadequate.

**PLAINTIFF'S EXPERIENCE WITH AIRTAGS**

64. Plaintiff lived in Missouri at the time of the tracking. She used Missouri's Safe at Home program because she needed to keep her location private.

65. Plaintiff had previously been in a romantic relationship with the Stalker. They were involved in family-court proceedings concerning their minor children.

66. In April 2025, Plaintiff received an Apple notification that an AirTag was moving with her. The notification came about ten minutes after the tracking began.

67. The AirTag was hidden. Plaintiff later learned that the AirTag had been placed in one of the children's shoes.

68. Plaintiff did not consent to the AirTag. She believed the device was being used to learn her protected address and to invade the safety measures she had taken.

69. Plaintiff reported the incident to Moscow Mills police. The criminal investigation is open.

70. The family-court transcript confirms that Plaintiff had already been to the police when the AirTag was discussed, and that Plaintiff told the Guardian ad Litem the behavior felt invasive and potentially threatening.

71. Plaintiff told attorneys, family or friends, and a therapist about the tracking. She has supporting court testimony, TalkingParents messages, police-report references, and therapy-record references.

72. Plaintiff no longer felt safe because the Stalker could use Apple's product to find where she lived. The tracking undermined the very protection Plaintiff sought through Missouri's Safe at Home program.

73. Plaintiff would have discovered the AirTag sooner, or the Stalker would have been deterred from using it, if Apple had adopted the safer designs and warnings alleged above.

## STATUTE OF LIMITATIONS AND TOLLING

74. Plaintiff's claims are timely under California law and under Missouri law. Plaintiff's claims accrued no earlier than the date she discovered, or reasonably could have discovered, that an AirTag had been used to track her.

75. On December 5, 2022, a putative class action was filed against Apple in the U.S. District Court for the Northern District of California. It is captioned Hughes v. Apple, Inc., No. 3:22-cv-07668-VC. The Hughes Action asserted claims on behalf of a proposed nationwide class of people who were tracked, stalked, or otherwise harmed through AirTags.

76. Plaintiff was a member of the putative class asserted in the Hughes Action. She was not a named plaintiff. She did not opt out. She relied on the named plaintiffs to press the class's claims.

77. On March 9, 2026, the Honorable Vince Chhabria entered an order denying class certification in the Hughes Action. Under American Pipe & Construction Co. v. Utah, 414 U.S. 538, 554 (1974), and Crown, Cork & Seal Co. v. Parker, 462 U.S. 345, 354 (1983), the filing of a class action tolls limitations for putative class members until class certification is denied.

78. Plaintiff discovered the AirTag in April 2025. The Hughes Action was already pending. The limitations period therefore was tolled before it expired, and Plaintiff filed within the tolled period after class certification was denied.

79. In the alternative, any limitations period was tolled under applicable equitable-tolling principles and the discovery rule.

**COUNT I**

**NEGLIGENCE**

**(California Law)**

80. Plaintiff repeats and realleges all preceding paragraphs.

81. Under California negligence principles, Apple owed Plaintiff a duty of reasonable care in the design, testing, marketing, distribution, and post-sale support of the AirTag.

82. Each relevant consideration supports that duty. Harm to people like Plaintiff was highly foreseeable. The certainty that such people would be injured was great. The connection between Apple's conduct and Plaintiff's injuries was close. Moral blame attaches to Apple's knowing release of an inadequately safeguarded product. And public policy favors preventing the harm.

83. As the manufacturer that designed the AirTag and placed it into the stream of commerce, Apple had a duty to avoid exposing foreseeable users and bystanders—including persons foreseeably tracked by the device—to unreasonable risks of harm. That duty included designing the AirTag so it would not create an unreasonable risk of use as an instrument of criminal stalking. Apple specifically anticipated and acknowledged that risk before launch.

84. Apple breached its duty. Among other things, Apple released the AirTag knowing its safeguards would only deter rather than prevent stalking; designed alerts that issue only after a tracking device has traveled with the victim for hours or days; designed a speaker too quiet, too brief, and too easily muffled to lead a victim to a concealed device; failed to adopt the feasible safer alternative designs alleged above; failed to adequately test the AirTag's anti-stalking features in real-world concealment scenarios; and continued to sell the AirTag after learning of tens of thousands of stalking reports, while publicly minimizing the problem.

85. Apple's breach was a substantial factor in causing Plaintiff's injuries. The Stalker's criminal use of the AirTag was not an unforeseeable superseding cause. It was the very harm that Apple anticipated, was warned about, and designed its safeguards—inadequately—to prevent.

86. As a direct and proximate result of Apple's negligence, Plaintiff suffered the injuries described above and is entitled to compensatory damages.

87. Apple acted with malice, oppression, or fraud within the meaning of Cal. Civ. Code § 3294. Its officers, directors, and managing agents knew of the probable dangerous consequences of the AirTag's design and consciously chose not to avoid them. Plaintiff is entitled to punitive damages under California law.

**COUNT II**

**STRICT PRODUCTS LIABILITY: DESIGN DEFECT**

**(California Law)**

88. Plaintiff repeats and realleges all preceding paragraphs.

89. Apple designs, manufactures, distributes, and sells AirTags. Apple placed the AirTag or AirTags used to track Plaintiff into the stream of commerce.

90. The AirTag is defective in design under the consumer-expectations test. It failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable way. Consumers may know that tracking devices can be used. But an ordinary consumer would reasonably expect that Apple had built effective safeguards to detect and prevent unauthorized tracking, particularly given Apple's promotion of the AirTag's anti-stalking features.

91. The AirTag is also defective in design under the risk-benefit test. Its foreseeable risk of facilitating stalking outweighs the benefits of its design. Practical, technically feasible alternative designs existed that would have prevented or significantly reduced Plaintiff's injuries.

92. The design defect was a substantial factor in causing Plaintiff's injuries. The Stalker's criminal use of the AirTag was not an unforeseeable superseding cause. It was the very harm the AirTag's anti-stalking safeguards were designed—and failed—to prevent.

93. As a direct and proximate result of the AirTag's defective design, Plaintiff suffered the injuries described above and is entitled to compensatory damages. Apple's conscious disregard of the known safety risks constitutes malice, oppression, or fraud under Cal. Civ. Code § 3294. Plaintiff is entitled to punitive damages under California law.

**COUNT III**

**PRODUCTS LIABILITY: FAILURE TO WARN**

**(California Law)**

94. Plaintiff repeats and realleges all preceding paragraphs.

95. Apple designed, manufactured, distributed, and sold the AirTag or AirTags used to track Plaintiff.

96. When the AirTag left Apple's possession, it posed known or knowable risks. Those risks included covert tracking of non-consenting persons and the failure of Apple's alerts to notify people in time, to locate the device, or to disclose the device's location reliably.

97. These risks presented a substantial danger when the AirTag was used in an intended or reasonably foreseeable way. Ordinary consumers, and people like Plaintiff who could be tracked by an AirTag, would not have recognized them.

98. Apple failed to adequately warn of these risks or to instruct the public on how to detect and guard against unwanted tracking. Among other things, Apple failed to provide timely alerts to people being tracked; failed to provide alerts that are persistent, distinct, and accompanied by a sound loud and continuous enough to locate a concealed device; failed to instruct tracked persons how to locate an AirTag hidden in a vehicle or personal property; failed to disclose that disabling Location Services would also disable unknown-AirTag alerts; and failed to accurately disclose the scope of AirTag stalking, which Apple publicly called rare.

99. Apple's failure to warn was a substantial factor in causing Plaintiff's injuries. Had Apple given adequate warnings and instructions, Plaintiff would have followed them and would have been able to identify and disable the AirTag sooner.

100. As a direct and proximate result of Apple's failure to warn, Plaintiff suffered the injuries described above and is entitled to compensatory damages. Apple's conscious disregard of the known risk also entitles Plaintiff to punitive damages under Cal. Civ. Code § 3294.

## COUNT IV

## VIOLATION OF THE UNFAIR COMPETITION LAW: UNLAWFUL PRONG

## (Cal. Bus. & Prof. Code §§ 17200 et seq.)

101. Plaintiff repeats and realleges all preceding paragraphs.

102. The Unfair Competition Law ("UCL") prohibits any unlawful, unfair, or fraudulent business act or practice. Cal. Bus. & Prof. Code § 17200.

103. Apple engaged in business acts and practices in California. On information and belief, Apple designed the AirTag and its safeguards, decided to release and keep selling it, and decided how to warn the public at its Cupertino headquarters.

104. Apple's conduct is unlawful. As alleged above, it constitutes negligence and products liability under California law. Each of those independent violations serves as a predicate for the UCL's unlawful prong.

105. Apple's conduct also violates the policy and purpose of the California Invasion of Privacy Act, Cal. Penal Code §§ 630 et seq. Apple designed, released, and kept selling the AirTag without adequate safeguards against unconsented location tracking. In doing so, Apple aided, and was a substantial factor in enabling, the electronic tracking of Plaintiff's location and movements by a third party without her consent.

106. Plaintiff has standing under Cal. Bus. & Prof. Code § 17204. She suffered injury in fact and lost money or property as a result of Apple's conduct, as alleged above.

107. Under Cal. Bus. & Prof. Code § 17203, Plaintiff seeks an order enjoining Apple from engaging in the unlawful business practices alleged here in connection with the sale of AirTags, and restitution to the extent permitted by law.

**COUNT V**

**VIOLATION OF THE UNFAIR COMPETITION LAW: UNFAIR PRONG**

**(Cal. Bus. & Prof. Code §§ 17200 et seq.)**

108. Plaintiff repeats and realleges all preceding paragraphs.

109. Apple's business practices are unfair. Releasing and continuing to sell AirTags with safeguards Apple knew were inadequate is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

110. Apple's business practices are also unfair because they undermine public policy tethered to specific constitutional and statutory provisions. Those provisions include the California Invasion of Privacy Act, Cal. Penal Code §§ 630 et seq., and the right to privacy in the California Constitution, Cal. Const. art. I, § 1.

111. Apple's business practices are further unfair because the injury to consumers is substantial, the injury is not outweighed by any countervailing benefit to consumers or competition, and consumers could not reasonably have avoided it. Plaintiff could not avoid a danger hidden from her and enabled by Apple's tracking network.

112. Reasonably available alternatives existed to further Apple's legitimate business interests. Apple's practices are a continuing course of unfair competition because Apple continues to sell AirTags.

113. Plaintiff has standing under Cal. Bus. & Prof. Code § 17204. She suffered injury in fact and lost money or property as a result of Apple's conduct, as alleged above.

114. Under Cal. Bus. & Prof. Code § 17203, Plaintiff seeks an order enjoining Apple from engaging in the unfair business practices alleged here in connection with the sale of AirTags, and restitution to the extent permitted by law.

## COUNT VI

## STRICT PRODUCTS LIABILITY: DESIGN DEFECT

**(Missouri Law; Mo. Rev. Stat. § 537.760; Pleaded in the Alternative)**

115. Plaintiff repeats and realleges the preceding paragraphs.

116. Apple transferred the AirTag in the course of its business. The AirTag was used in a reasonably anticipated manner because covert tracking and stalking were foreseeable risks of Apple's design.

117. The AirTag was in a defective condition and unreasonably dangerous when put to a reasonably anticipated use. Missouri law recognizes strict products liability for products that are defective and unreasonably dangerous when put to a reasonably anticipated use.

118. The defect directly caused Plaintiff's injuries. Safer alternative designs would have prevented or substantially reduced the risk that the Stalker could use an AirTag to learn Plaintiff's location.

**COUNT VII**

**STRICT PRODUCTS LIABILITY: FAILURE TO WARN**

**(Missouri Law; Mo. Rev. Stat. § 537.760; Pleaded in the Alternative)**

119. Plaintiff repeats and realleges the preceding paragraphs.

120. The AirTag was unreasonably dangerous without adequate warnings or instructions. Missouri recognizes that a product may be unreasonably dangerous because it is sold without adequate warning.

121. Apple failed to provide adequate warnings and instructions to people foreseeably tracked by AirTags, including warnings that an AirTag could be hidden in a child's shoe or belongings and used to identify a protected address.

122. Apple's failure to warn directly caused Plaintiff's injuries.

**COUNT VIII**

**NEGLIGENCE**

**(Missouri Law; Pleaded in the Alternative)**

123. Plaintiff repeats and realleges the preceding paragraphs, except the California-law counts.

124. Apple owed a duty to use ordinary care in designing, testing, marketing, warning about, and supporting AirTags.

125. Apple breached that duty by failing to design the AirTag to be reasonably safe, failing to warn of known stalking risks, and failing to adopt reasonable anti-stalking protections. Missouri distinguishes strict product liability from negligence but permits negligence product claims based on the same operative facts when the manufacturer's conduct failed to meet the applicable standard of care. See Johnson v. Auto Handling Corp., 523 S.W.3d 452 (Mo. 2017).

126. Apple's negligence proximately caused Plaintiff's injuries.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that the Court enter judgment against Apple and award the following relief:

a. Judgment in Plaintiff's favor on the causes of action in this Complaint, including, in the alternative, the Missouri-law causes of action;

b. Actual damages, including for past and future mental anguish and emotional distress, lost wages, relocation expenses, safety costs, vehicle-related losses, the cost of any related treatment, and other damages in an amount to be proven at trial and exceeding $75,000;

c. Punitive damages under Cal. Civ. Code § 3294 and, in the alternative, punitive or exemplary damages under Missouri law, in an amount to be proved at trial;

d. Restitution under Cal. Bus. & Prof. Code § 17203 to the extent permitted by law;

e. Reasonable attorney's fees under Cal. Civ. Proc. Code § 1021.5 and any other applicable law;

f. Pre-judgment and post-judgment interest as permitted by law;

g. Costs of suit; and

h. Such other relief as the Court deems just and proper.

Dated: November 3, 2026

Respectfully submitted,
**STINAR LANNEN, PLLC**

By: /s/ ______________________
Parker G. Stinar, Esq. (pro hac vice forthcoming)
Patrick C. Lannen, Esq. (pro hac vice)

Counsel for Plaintiff

**DEMAND FOR JURY TRIAL**

Under Federal Rule of Civil Procedure 38(b) and Civil L.R. 3-6, Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: November 3, 2026

Respectfully submitted,
**STINAR LANNEN, PLLC**

By: /s/ ____________________
Parker G. Stinar, Esq. (pro hac vice forthcoming)
Patrick C. Lannen, Esq. (pro hac vice)

Counsel for Plaintiff